COYT IRBY v. SOUTHERN RAILWAY COMPANY, a CORPORATION, AND F. E. ROSS.

(Filed 7 June, 1957.)

1. Railroads § 4—

In approaching a grade crossing both the trainmen and travelers upon the highway are under reciprocal duty to keep a proper lookout and exercise that degree of care which a reasonably prudent person would exercise under the circumstances to avoid an accident.

**2. Same—**

While a railroad company is under duty to give timely warning of the approaching of its train to a public crossing, its failure to do so does not relieve a traveler of the duty to exercise due care for his own safety, which includes the duty not only to look and listen before entering upon the track, but also to look and listen at a place where and a time when his precaution will be effective.

**3. Negligence § 10—**

The doctrine of last clear chance does not arise until it appears that the injured person has been guilty of contributory negligence, and no issue with respect thereto must be submitted to the jury unless there is evidence to support it.

**4. Railroads § 4—**

In order to recover on the doctrine of last clear chance, plaintiff has the burden of showing that at the time he was struck by defendant's train he was in an apparently helpless condition on the track, that the engineer saw or by the exercise of ordinary care should have seen him and appreciated his danger and helpless condition in time to have stopped the train before striking plaintiff, and that the engineer failed to exercise such care, which proximately resulted in the injury.

**5. Same—**

The doctrine of last clear chance does not apply if at the time plaintiff is in apparent possession of his strength and faculties, and the engineer has no information to the contrary, since under such circumstances the engineer is not required to stop the train or even slacken its speed for the reason that he may assume even up until the very moment of impact that the plaintiff will use his faculties for his own protection and leave the track in time to avoid injury.

**6. Same—**

In this action by a motorist to recover for damages to his car and injury to his person received in a crossing accident, the evidence *is held* to require nonsuit on the ground of contributory negligence and not to warrant the submission of the issue of last clear chance to the jury.

JOHNSON, J., took no part in the consideration or decision of this case.

APPEAL by plaintiff from *Rudisill, J.*, at 23 April, 1956, Schedule "A" Regular Civil Term of MECKLENBURG, as No. 237 at Fall Term, 1956, carried over to Spring Term, 1957.

Civil action to recover for personal injuries and property damage allegedly caused by negligence of defendants arising out of a collision between plaintiff's automobile and a train of corporate defendant at a public railroad crossing.

These facts appear to be uncontroverted: The collision occurred at the East 36th Street intersection with main line railroad tracks within the city of Charlotte, N. C.

Plaintiff alleges in his complaint and upon trial offered in evidence Chapter 4, entitled "Railroad Companies," of the Code of Charlotte, of which these sections, here specifically pleaded, were in full force and effect:

"Section 2. Speed Limit of Trains. The speed of railway trains in the city of Charlotte shall not exceed twenty-five (25) miles per hour, provided that such speed shall not exceed fifteen (15) miles per hour at any crossing, and such speed shall be further reduced at certain crossings as provided herein.

"Section 3. Speed of Trains at Certain Crossings. Watchmen, Flagmen, Gates, Signal System, Stopping of trains required at certain crossings: (a) Southern Railway—Atlanta to Washington—Double Track: All railway companies operating a train across the following streets where the double tracks of the Southern Railway Company now cross said streets shall comply with the following: 'Electric signal systems shall be maintained at the Dowd Road, 36th Street and West Ninth Street crossing.' "

Plaintiff alleges that defendant Ross, while so operating the diesel locomotive engine and train, was negligent in that he failed (a) to observe the plaintiff's automobile; (b) to keep a proper lookout; (c) to properly blow his whistle or horn or sound other proper warning that the train was going across the said crossing; (d) to keep the train under control; (f) to yield the right of way to plaintiff, and (g) to avoid colliding with the plaintiff's vehicle; and in that (e) he operated said diesel and train at a high, excessive and unlawful rate of speed and at a speed that was greater than was prudent under the circumstances and conditions then and there existing; and that (h) he otherwise operated the diesel and train in a reckless, careless and negligent manner which they knew or, in the exercise of due care, should have known would be likely to endanger the lives and property of persons lawfully using said street and crossing.

Plaintiff also alleges that defendants, and each of them, were further negligent on the occasion in question in that:

(a) They negligently and carelessly failed to keep the right of way clear and unobstructed of grass and weeds along the easterly side of said tracks at said crossing, in direct violation of ordinance in Chapter 4, entitled "Railroad Companies" of the Code of the city of Charlotte, here specifically pleaded, and which was in full force and effect: "Section 9. Ditches, Etc., Along Tracks must be kept clear of grass, etc. Every railroad company whose tracks extend with the limits of this city, shall keep the ditches or gutters on both sides of and between said tracks on its right of way clear of grass, weeds, trash, garbage and filth of every kind . . ."

(b) "They negligently and carelessly failed to maintain a proper electrical signal system at said crossing . . . to give the plaintiff adequate warning and notice that the gates were about to be lowered . . . to give the plaintiff an adequate and reasonable opportunity to bring his vehicle to a stop outside of the gates and crossing subsequent to the signal and prior to the closing of said gates, and crossing of the train," and (c) to "provide and maintain a watchman and flagman at said crossing . . ." etc.

And plaintiff further alleges that as a direct and proximate cause and result of the negligence of defendants as set forth above, he was injured in person, and his automobile was damaged, in large amounts.

Defendants, answering complaint of plaintiff, deny each and all the allegations of negligence so alleged, and for a further answer and defense say: That if they were guilty of any negligence, plaintiff was guilty of negligence which directly caused and contributed to any injury or damage he may have sustained in that:

"(a) He failed to stop his automobile a safe distance from said track in obedience to the automatic signals at said crossing.

"(b) He stopped his automobile in close proximity to said track and allowed it to remain in such position.

"(c) He failed to get out of said automobile and into a place of safety, although he had sufficient time within which to do so after the said automobile was stopped and before it was struck by said train. And said contributory negligence is hereby expressly pleaded in bar of any recovery herein."

Plaintiff, replying to defendants' answer, denies each of the averments of the further answer and defense, and, by way of further reply, pleads in substance that even if plaintiff were guilty of any negligence, defendants by the exercise of due care should have avoided the injury and damage to the plaintiff, in manner specifically set forth.

As revealed by the pleadings and evidence offered upon trial in Superior Court, this case involves a grade crossing collision on E. 36th Street in Charlotte, N. C., between automobile of plaintiff and train of corporate defendant operated by individual defendant. It occurred on 15 October, 1954, around 7:00 o'clock p.m. It was dark. Plaintiff had headlights of his automobile burning. "The weather was nice and dry." There was a street light at the crossing.

The street runs in general east-west direction. The tracks of the railway run in general north-south direction. The street is forty-five feet wide. It has four lanes of travel, two in each direction. Plaintiff was traveling west, in the most northern lane of travel. The train of defendants was being operated in northern direction, that is, from south to north. There was an electric signal gate at the northeast corner of the intersection, and another at the southwest corner,—each fifteen feet

from the edge of the tracks. Each gate comes down one halfway across the street blocking traffic moving toward the crossing on the right-hand side—the left being open. There were two main line tracks of the railroad eight feet apart and five feet inside rails, curving to the left of northbound trains. And there were three other tracks beside the main tracks, a switch track that branched off the easternmost main line track some distance south of the crossing, and two side tracks more distant from the main line over next to the building.

There was a small house 8' by 8' wide and 8½ feet high, estimated to be 35 feet south from the south edge of the street pavement. And the New England Waste Company warehouse fronts on the south side of the street, the western edge of the warehouse being approximatly 100 feet from the first main line track.

Plaintiff was driving a 1954 Ford, two-door coach, brand new, had it four or five weeks. He testified: "I had driven it 900 miles and knew how it operated. It had good brakes. The gears were in good condition. The motor would not cut off with you in traffic. It had an automatic transmission. When you were going forward you did not have to change gears with your hands. It had a drive range on there. It had two forward gears . . . I had my foot off the gas pedal. It was on the brakes. If I had put my foot on the gas pedal at same rate of speed it would have gone across . . ."

Plaintiff was asked this question: Q. "Now, as you came down to the track you were going about 20 miles an hour, is that right?" to which he answered, "Yes, sir." And again plaintiff testified: "I knew I was about 20 feet from the track. I figured I was 20 feet from the signal and 30 feet from the track . . . I did not stop until I got on the track." And to this question, "And you drove over 30 feet, didn't you?" he answered: "I drove about 35 feet, yes, sir. That's the distance it took me to stop." Again, "I stopped as quickly as I could. That put me on the rail . . . I knew I was going to stop. I thought I was going to stop before I got to it, but I didn't; I misjudged . . ."

Plaintiff testified that traveling west he stopped at a traffic control signal for vehicles about a block and a half from the crossing in question. Quoting him, "I was the first car to pull away from the light. There were several cars behind me back there. I went ahead and drove westerly on 36th Street. I proceeded on from the stop light at about 20 to 25 miles an hour. I came down to this corner of New England Waste Company. I looked to the left and right and didn't see anything. I continued on about 50 feet and looked to the left and right again. I didn't see anything. As I got about 20 feet approximately from this signal it gave its signal. It started flashing. There is a bell there that rings. So I immediately applied my brakes. I knew a train was coming and stopped. I didn't see the train until I came to a complete stop.

At the same time I was shifting into reverse gear to get off the tracks. My car went back about three feet and hit some object which was possibly another car. I continued to try to back up but the train hit me before I could do anything."

Again plaintiff testified: "Yes, I said when I did see the train it had flashing lights. The first time I saw it, it was about 250 feet down the track . . . I was doing about 20 miles an hour the last 100 feet to the track. I was not slowing down to a stop. I was just what you might say coasting along. I didn't have my foot on the gas. I went 20 miles an hour until about 35 feet from the track and in the last 35 feet I slowed up to a stop. I estimate the train was 250 feet away from me when I observed it after I got in a stopped position."

Plaintiff also testified that the front of his car was hanging about two feet over the first rail on the eastern line,—that the right front of the engine collided with the left front of his car.

The speed of the train is variously estimated at from 40 to 65 miles per hour.

Plaintiff testified that while he had only been over that crossing twice prior to the time in question, and was not familiar with the type of electric automatic railroad signal, he had crossed other intersections with that same type equipment when the bell starts ringing.

Plaintiff further testified that with the exception of the sidetrack and except for the shrubbery and grass which was about 5 feet high along the bank, "You have a clear view from the street down the track for the last 48 feet," and that "it might be I was a little more than 5 feet high sitting in the car."

And plaintiff repeated that the first time he looked, to the left and right, was when he was approximately 100 feet back, just as he got to the edge of that New England Waste house, and the second time when he was about 80 feet from the crossing.

The engineer testified under adverse examination: "I did sound a warning prior to reaching the crossing. I had the bell ringing and I blew the whistle twice—first when in about 400 or 500 feet of the crossing, and the second time in 200 or 300 feet of the crossing."

Plaintiff's witness Deaton testified that he was traveling in opposite direction to plaintiff; that he was approximately 175 feet from the crossing when he first observed Irby's car; that he observed Irby's vehicle and then immediately the train; that in his estimate the train was five to six hundred feet south of the crossing at the time he first observed it; that the headlight was burning on the engine, and that he did not see Irby make any effort to get out of the automobile. "After I saw him it is my opinion that he had 7 to 9 seconds before the collision." The plaintiff testified: "From the time I came to a stop until the time of the impact I would estimate 3 seconds elapsed."

At the close of plaintiff's evidence motion of defendants for judgment as of nonsuit was allowed, and from judgment in accordance therewith plaintiff appeals to Supreme Court, and assigns error.

*William H. Booe for Plaintiff Appellant.*

*W. T. Joyner and Robinson, Jones & Hewson for Defendants Appellees.*

WINBORNE, C. J.   If it be conceded that the evidence shown in the case on appeal is sufficient to support a finding by the jury that defendants were negligent at least in operating the train at a speed in excess of the city ordinance, the evidence offered by plaintiff, as shown in the case on appeal, establishes as a matter of law that plaintiff, by his own negligence, as a proximate cause, contributed to his injury.   *Godwin v. R. R.*, 220 N.C. 281, 17 S.E. 2d 137; *McCrimmon v. Powell*, 221 N.C. 216, 19 S.E. 2d 880; *Bailey v. R. R.*, 223 N.C. 244, 25 S.E. 2d 833; *Parker v. R. R.*, 232 N.C. 472, 61 S.E. 2d 370; *Dowdy v. R. R.*, 237 N.C. 519, 75 S.E. 2d 639; *Boone v. R. R.*, 240 N.C. 152, 81 S.E. 2d 380.

In approaching a grade crossing both the trainmen and travelers upon the highway are under reciprocal duty to keep a proper lookout and exercise that degree of care which a reasonably prudent person would exercise under the circumstances to avoid an accident.   Thus a railroad company is under duty to give travelers timely warning of the approach of its train to a public crossing.   Yet its failure to do so does not relieve the traveler of the duty to exercise due care for his own safety, and the failure of a traveler to exercise such care bars recovery, when such failure is a proximate cause of the injury.   *Godwin v. R. R., supra.*

In the instant case plaintiff knew that he was approaching a railroad, and he knew he was entering a zone of danger.   He was required before entering upon the track to look and listen to ascertain whether a train was approaching.   *Bailey v. R. R., supra.*

Hence as stated in *Parker v. R. R., supra,* opinion by *Barnhill, J.,* later *C. J.,* "It does not suffice to say that plaintiff stopped, looked and listened.   His looking and listening must be timely, so that his precaution will be effective."

The doctrine of last clear chance does not arise until it appears that the injured person has been guilty of contributory negligence, and no issue with respect thereto must be submitted to the jury unless there is evidence to support it.   *Redmon v. R. R.*, 195 N.C. 764, 143 S.E. 829; *Cummings v. R. R.*, 217 N.C. 127, 6 S.E. 2d 837; *Mercer v. Powell*, 218 N.C. 642, 12 S.E. 2d 227.

And when the doctrine of last clear chance is relied upon, the burden is on the plaintiff to show by proper evidence:   (1) That at the time

the injured party was struck by a train of defendant he was down, or in an apparently helpless condition on the track; (2) that the engineer saw, or, by the exercise of ordinary care in keeping a proper lookout could have seen the injured person in such condition in time to have stopped the train before striking him; and (3) that the engineer failed to exercise such care, as the proximate result of which the injury occurred. See *Cummings v. R. R., supra; Mercer v. Powell, supra,* and cases cited.

Indeed the doctrine of last clear chance does not apply in cases where the person upon the track of a railroad, at the time, is in apparent possession of his strength and faculties, the engineer of the train that produces the injury having no information to the contrary. Under such circumstances the engineer is not required to stop the train, or to even slacken its speed, for the reason he may assume until the very moment of impact that such person will use his faculties for his own protection and leave the track in time to avoid injury. *Cummings v. R. R., supra; Mercer v. Powell, supra,* and cases cited.

Moreover, the principle is restated by *Barnhill, J.,* later *C. J.,* in *Ingram v. Smoky Mountain Stages,* 225 N.C. 444, 35 S.E. 2d 337, in this manner: "To sustain the plea (of last clear chance) it must be made to appear that (1) the plaintiff by his own negligence places himself in a dangerous situation, (2) the defendant saw, or by the exercise of reasonable care should have discovered, the perilous position of plaintiff, (3) in time to avoid injuring him, and (4) notwithstanding such notice and imminent peril negligently failed or refused to use every reasonable means at his command to avoid impending injury, (5) as a result of which plaintiff was in fact injured," citing cases. To like effect is *Aydlett v. Keim,* 232 N.C. 367, 61 S.E. 2d 109, opinion by *Denny, J.* See also *Mfg. Co. v. R. R.,* 233 N.C. 661, 65 S.E. 2d 379.

The discovery of the danger, or duty to discover it, as basis for a charge of negligence on the part of defendant after the peril arose, involves something more than a mere discovery of, or duty to discover, the presence of the injured person, it includes a duty, in the exercise of ordinary care under the circumstances, to appreciate the danger in time to take the steps necessary to avert the accident.

"Peril and the discovery of such peril in time to avoid injury constitute the backlog of the doctrine of last clear chance," so wrote *Brogden, J.,* for the Court in *Miller v. R. R.,* 205 N.C. 17, 169 S.E. 811. See also *Bailey v. R. R.,* 223 N.C. 244, 25 S.E. 2d 833; *Ingram v. Smoky Mountain Stages, supra.*

"The last clear chance does not mean the last possible chance to avoid the accident." *Lee v. R. R.,* 237 N.C. 357, 75 S.E. 2d 143.

Testing the evidence offered by plaintiff in the light of the principle here invoked, it is apparent that the trial court did not err in sustaining defendant's motion for judgment as of nonsuit.

Other assignments of error have been given due consideration, and in them prejudicial error is not made to appear.

Affirmed.

JOHNSON, J., took no part in consideration or decision of this case.